SEATTLE DISTRICT NO. 3 MANTLE
CLUB v. UNITED STATES.

No. 45228.

Court of Claims.

Dec. 7, 1942.

811

Paul F. Myers, of Washington, D. C. (James Craig Peacock, of Washington, D. C., and Maurice R. McMicken, of Seattle, Wash., on the brief), for plaintiff.

Fred K. Dyar, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson, of Washington, D. C., on the brief), for the United States.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

Plaintiff sues to recover taxes, together with penalties and interest, paid by plaintiff on the initiation fees of its members from 1933 when plaintiff club was organized, through May 1936. The tax was not collected by plaintiff from its members when the initiation fees were paid, and later when the Collector made demand for the tax the plaintiff elected to pay it itself rather than to allow it to be assessed against its members. Its members have not reimbursed plaintiff for the tax so paid. If plaintiff was a "social, athletic, or sporting club or organization" during this period, the tax was due under Section 501 (a) (1) and (2) of the Revenue Act of 1926, as amended by Section 413(a) of the Revenue Act of 1928, now Section 1710, Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1710, and cannot be recovered. Plaintiff denies that it was such a club. In its petition plaintiff made the further claim that even if it did answer the description of a "social, athletic, or sporting club", its initiation fees were still not taxable because it was a "fraternal society, order, or association, operating under the lodge system", and therefore exempt under subdivision (c) of the sections above cited. This latter contention has been abandoned, leaving only the one issue as stated above.

The question of social club vel non has been litigated in numerous cases, many of them in this court. Recent and rather complete citations of the cases have been made in Engineers Club of Philadelphia v. U. S., 42 F.Supp. 182, 95 Ct.Cl. 42, and Duquesne Club v. Bell, 3 Cir., 127 F.2d 363, and will not be repeated here. The decisions are, in general, mere expositions of the text of Article 36 of Treasury Regulations 43, in effect since its promulgation in 1917. Its relevant part is as follows:

"Art. 36. Social clubs.—Any organization which maintains quarters of arranges periodical dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse, is a 'social * * * club or organization' within the meaning of the Act, unless its social features are not a material purpose of the organization but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business. The tax does not attach to dues or fees of a religious organization, chamber of commerce, commercial club, trade organization, or the like, merely because it has incidental social features, but, if the social features are a material purpose of the organization, then it is a 'social * * * club or organization,' within the meaning of the Act. An organization that has for its exclusive or predominant purpose religion or philanthropic social service (or the advancement of the business or commercial interests of a city or community) is clearly not a 'social * * * club or organization.' Most fraternal organizations are in effect social clubs, but if they are operating under the lodge system, or are local fraternal organizations among the students of a college or university, payments to them are expressly exempt."

Our question is, then, whether plaintiff's social features were "a material purpose of the organization", or whether they were, as plaintiff claims, "subordinate and merely incidental to the active furtherance of a different and predominant purpose * * *". We think they were the latter, and that plaintiff may recover the tax it was compelled to pay.

The constitution and by-laws of the parent Mantle Club, under which plaintiff functioned, are set out in Finding 2. In these club tax cases the stated purpose of an organization does not determine its taxable status, if its actual operations are different from the stated ones. Here, paragraph 2 of the by-laws states as one purpose of the club: "To foster and cultivate the social, educational and business relations of the members; to improve their standards of honor, ethics, efficiency and productivity; to broaden their interests in the pursuit of their occupations; and to encourage among the members a true feeling of friendship and a friendly spirit of mutual cooperation."

Also, paragraph 5 states its purpose: "To erect, equip and maintain social club houses and other appropriate buildings for the use and enjoyment of all the members of the Club upon and under such terms and conditions, and subject to such rules, regulations and restrictions as are for the best interests of the members." We shall see that these "social" purposes were not in fact carried out to an extent sufficient to bring the club within the taxing statute.

In securing members of plaintiff club, a lengthy prospectus, which is reproduced in Finding 12, was used. It makes no mention of social activities or advantages as such. It speaks of "Fraternal association such as other fraternal organizations of high standing furnish to their members * * *", and again of "the usual benefits and privilege of a fraternal organization", and these statements were probably meant to connote sociability. But the other items mentioned in the prospectus "to improve his [the member's] ethical standards, his business standing, and his financial status" were the ones that, in fact, received the attention of the club. The member's ethical being was exposed to improvement by an almost unbelievably heavy and constant dosage of the writings of the national founder of the club, H. J. Monjar. These writings, or "messages", took up, one by one, qualities such an honor, loyalty, common sense, courage, justice, ambition and pride, self control, confidence, etc. They were long, platitudinous, repetitious, and hence dull. They seem, however, to have been well tuned to the membership, and to have given it substantially what it expected and paid for.

The monthly message was read at the monthly meeting of the whole Seattle Club, which comprised some 3,000 members in 1936. They met in the municipal auditorium which was hired for the meetings. Some former members testified that they were bored, or even put to sleep, by the reading of the message. Such reactions are understandable, but have no tendency to prove that the meetings were social.

Attendance at the monthly meetings was compulsory, and this rule was rigorously enforced. The dues of $2 per person were paid at the meeting. The initiation fee of $20 was collected before admission to the club. The Key magazine, published by Monjar and other leaders of the national Mantle Club, was sold for twenty-five cents a copy at the monthly meetings. It reprinted the preceding monthly message, and contained advice as to how to use the ethical principles of the message to work out the problems of the members. Two of Monjar's books were for sale at $2 each. They contained, in general, the same kind of material as the messages.

After the monthly meetings, which lasted from two and one half to three and one half hours, members who had progressed well in the work of the club were given the "privilege" of lending money to Monjar, through the managers of the Seattle Club, without interest and with no promise to repay the money at any particular time. The members who made these loans seem to have been impelled by their admiration for the character and ability of Monjar, principally as shown by his messages, and by some vague promise of large returns from their loans in the future.

Between the monthly meetings there were meetings of geographical subdivisions of the Seattle Club, Sections of 1,000, Divisions of 100, and Captain's groups of 10. They talked about practically the same things as were discussed at the preceding monthly meeting, but the lesser people had more opportunity to do the talking. In 1935 there were 6,582 meetings; in 1936, 7,248 meetings. Smoking at the meetings, and drinking at and on the way to and from the meetings was forbidden. Minutes of all meetings were made and transmitted to the national office, and comments, sometimes severely critical, were sent back. Members' wives protested at the large number of evenings taken up by the meetings, and some members grew weary and dropped out.

By faithful attendance at meetings, and performance of other acts approved by the club, co-points were amassed, which, when sufficient, entitled the member to be made a "full member" by a somewhat elaborate ritual.

Plaintiff had no club house. Its permanent quarters were mere business offices and no sociability occurred there.

One of plaintiff's standing committees was a welfare committee, appointed by the Local Board of Governors, whose function was to have charge of the so-called "unofficial activities" of the club. Under this committee were several subcommittees, including a recreation committee and an entertainment committee. The Local Board of Governors tended to deemphasize the

development of the recreational activities of the members. In 1934 the Board instructed the welfare committee as follows:

"Do not make a dance or a game a major activity. Welfare work is to be a help in time of need. Would it not be more laudable to help some one who needs it than spend money on basketball or something of that sort."

In 1936 the National Board reminded the Local Board that the chairmanship of the welfare committee was not an excuse for non-attendance at a captain's meeting, with the following admonition:·

"This is something that should never have happened. On no account should an unofficial activity be ever allowed to interfere with the official functions of the official Contact Structure."

It should be observed that this message came soon after the question of plaintiff's liability for taxes was broached by the Government.

There were, in the three years in question here, some twenty-nine picnics and parties, including swimming, skating, fishing, and card parties, dances, and a minstrel show, held under club auspices. To these the wives and families of the members were welcome. The club had no equipment or quarters for these affairs. There was no regularity about their occurrence. They were arranged for the occasion, just as a church or bar association or labor union might arrange an outing. None of these activities were financed from club funds, the welfare committee being required to support its own activities. The welfare committee had expenditures of $1,536.30 and a deficit of $128.13 in 1935, and a balance of $1,733.28 after expenditures of $1,826.18, including those for the Sick Committee and the Christmas Fund, in 1936.

At the beginning of the monthly meetings there was, sometimes, music by the band, orchestra or glee club. There were announcements of impending parties and athletic contests. The length of time consumed by these announcements varied with the speakers, but was small in comparison with the hours devoted to the hearing and discussion of the message.

When the meetings of "divisions" of 100 members were held, in the neighborhoods where the members lived, the members frequently ate dinner together in a restaurant or a church, and then held their serious discussion in the same room. They had no regular place for such meetings, and by this method they obtained a meeting place, by buying the dinner. During these dinners the members engaged in ordinary social conversation.

While these activities, of a recreational nature, when tabulated, look rather extensive, they were small in comparison with all the activities of the club, with its large membership. For example, these small teams of amateur players wearing the letters of the Mantle Club could not fix upon the Club the character of an athletic or sporting club. Any religious or educational or professional organization of men of 21 years and above would almost certainly produce athletic teams, in season. Five young men want to play basketball. They are members of the Mantle Club, so they go into their games wearing the Mantle Club name. They get the recreation committee to buy their suits, if they can, and pay for them out of the proceeds of a minstrel show or a dance. This does not make the club an athletic club. As to the parties and picnics, they are entirely comparable to the occasional diversions of religious, business, professional and labor organizations. In estimating their weight in the whole of Mantle Club activities, we remember that there were, during this period, some 14,000 unquestionably serious meetings, large and small, devoted to the self-improvement of the members by instruction and discussion. In this comparison, the social activities were "subordinate and merely incidental to the active furtherance of a different and predominant purpose" within the meaning of the Treasury Regulation. Here, for a club of some 3,000 members, there was no clubhouse, no dining room, no bar, no game room, no library, no gymnasium, in short, none of the facilities commonly associated with social or athletic clubs. We conclude that the Commissioner of Internal Revenue should not have classified plaintiff as a social club, and that it is entitled to recover the taxes, penalties and interest collected from it.

It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

JONES, Judge (dissenting).

I cannot agree to the conclusion reached by the majority.

A club may be of a dual nature. According to the regulations issued pursuant to the statute it is not necessary that a club be purely a "social, athletic or sporting" club in order for it to fall within the taxing provision. That need not be its major purpose. It is only necessary that such be one of its material purposes or activities.

It is difficult to escape the conclusion that these activities were a material part or purpose of the organization.

The welfare committee, appointed by the local Board of Governors and which included a member of the Board as one of its members, controlled and stimulated "unofficial activities" of the club. Subdivisions of the welfare committee included an employment committee, a sick committee, a recreation committee and an entertainment committee. There were dinners for division meetings, ice skating parties, swimming parties, fishing derbies, card parties, motion pictures, dances, annual picnics, and minstrel shows. Twenty-nine separate affairs, not including dinners, preceded the division meetings. The club had a band, an orchestra, a golf club, and a drum and bugle corps. Athletic teams included baseball, basketball, hockey, indoor baseball, softball, bowling, golf and tennis.

While no clubhouse had been built it was one of the charter purposes and from the formation of the club was a hope of the membership. In the meantime quarters were rented in a business building.

The minutes of the monthly meetings were replete with references to announcements of social and athletic activities of the club.

True, there were many meetings at which discussion was had of ideals, including honor, loyalty, common sense, courage, justice, ambition, pride, self-control, confidence, energy, responsibility, and numerous other undisputed qualities recognized as desirable by all self-respecting people.

Much emphasis was placed at the monthly meetings on prompt payment of dues. The initiation fee was $20 and the monthly dues were $2. All of the initiation fee and half the dues went to the national organization which was largely under the control of a talented gentleman by the name of Monjar, who was the founder.

At each monthly meeting a message from Mr. Monjar was read. He peddled his meditations and palmed them off in the form of ponderous platitudes, and in effect at so much per platitude, or rather on a monthly installment basis. We are led to make this statement because of the amount of money which went to national headquarters, none of which does the record show ever came back to the local association, except in the form of preachments, tritish advice, and truisms, the points of which by repetition must have become as dull as an old froe, and the cost of which could have been but a small fraction of the total intake. Undoubtedly he was a genius at organization, and, while his messages were in no way objectionable and contained much of merit, stripped of their excess verbal baggage, they amounted to nothing more than a restatement of age-old and generally accepted principles and ideals.

The members listened to these messages. Why shouldn't they? They had paid for them. Listening to these ethical discussions bored some of the members, even made some of them sleepy, but then there was a fine, in addition to the dues, if they didn't attend the meetings.

While there were regular meetings, and in the circumstances, a rather full attendance, we do not see how that alters the fact that the social, athletic, and sporting features were a material part or purpose of the organization. In fact, it is doubtful if the club could have survived but for such activities. It cost the member $20 to get in, but he could get out for nothing, and many of them probably would have done so but for the activities mentioned. However, with almost every conceivable kind of social, athletic, and sporting undertaking, plus the fact that many of their neighbors belonged and the possibility of business advantage, it is not unnatural that they should remain as members.

One natural inquiry is: Why did men join this organization? It does not seem possible that commonplace discussions of well-known principles could have been the chief inducement. Looking at the entire set-up, it is inescapable that at least a material part of the attraction was the desire for social contact with their fellow men, the desire to see and take part in the athletic events and of visiting with each other at the picnics and dinners. These things, the chance of rubbing elbows, of conversation with different individuals at their frequent meetings, which were usually accompanied with food of some kind,

816

afford a more plausible explanation of why men wished to belong to the club.

It was not a poor man's club. The dues, initiation fees, and penalties for failure to attend show that only a man of fair means could afford membership.

The minutes of the meetings show that some form of social gathering and athletic features were almost always announced, evidently for the purpose of keeping up interest and thereby retaining membership so that dues would be paid regularly. Without these social and athletic attractions the club could not have lasted. Those in charge evidently realized this fact, as is shown by the gradually increasing attention paid these activities.

The Commissioner of Internal Revenue having decided the issue adversely, the burden of proof is on plaintiff to show that these activities were not a material part or purpose of the organization. It has not discharged this burden.

I would hold that the social, athletic, and sporting features are a material purpose of the organization, and that it is therefore subject to the tax.

WHALEY, Chief Justice, concurs in this opinion.